UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

BILLY E. KNIGHT,

                              Plaintiff,

-vs-                                                      Case No.  6:04-cv-569-Orl-KRS

COMMISSIONER OF SOCIAL
SECURITY,

                              Defendant.
_____

ORDER

        This matter came before the Court for consideration without oral argument on the

complaint filed by Billy E. Knight seeking review of the final decision of the Commissioner of the

Social Security Administration ("Commissioner") denying his claim for social security disability

benefits.  Doc. No. 1.  The Commissioner answered the complaint and filed a certified copy of the

transcript of the proceedings before the Social Security Administration ("SSA").  Doc. No. 9.  The

parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant

to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and Middle District of Florida Local

Rule 6.05 for adjudication.  Doc. Nos. 11, 12.

I.       PROCEDURAL BACKGROUND.

        On April 20, 2001, Knight applied for disability benefits under the Federal Old Age,

Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401 *et seq.*, and for

supplemental security income under the Supplemental Security Income for Aged, Blind, and

Disabled program ("SSI"), 42 U.S.C. § 1382 *et seq.*, alleging a disability onset date of December

30, 1999.  TR. 51-53, 209-11.  The SSA denied Knight's applications both initially and on

reconsideration.  TR. 40-41, 44-45, 204-08.  Then, Knight made a timely request for a hearing.

TR. 38.

      An Administrative Law Judge ("ALJ") held a hearing on March 18, 2003.  TR. 226.

Knight, who was accompanied by his representative, testified at the hearing.  TR. 226-45.

      The ALJ assumed that Knight had not engaged in substantial gainful activity since

December 30, 1999, the alleged onset date of his disability.  TR. 16.[1]  The ALJ concluded that the

medical evidence showed Knight had the medically determinable impairments of bilateral carpal

tunnel syndrome,[2] degenerative disc disease of the cervical, thoracic, and lumbar spine, and

hypertension.  TR. 17.  The ALJ found that these impairments or combination of impairments

were severe, but that they did not meet any of the listed impairments in the SSA's regulations.  TR.

21.  The ALJ concluded that Knight's mental impairments were not severe because they resulted in

only mild limitations of function.  TR. 17.

      The ALJ found further that Knight's allegations regarding his limitations were not totally

credible.  TR. 21.  The ALJ reasoned as follows:

---

[1] There was insufficient evidence for the ALJ to determine whether work Knight performed in 2001 was substantial gainful activity.  The ALJ assumed for purposes of his analysis that this was an unsuccessful work attempt.  TR. 16.

[2] "Carpal tunnel syndrome occurs when the median nerve, which runs from the forearm into the hand, becomes pressed or squeezed at the wrist. The median nerve controls sensations to the palm side of the thumb and fingers (although not the little finger), as well as impulses to some small muscles in the hand that allow the fingers and thumb to move. The carpal tunnel - a narrow, rigid passageway of ligament and bones at the base of the hand ¾ houses the median nerve and tendons. Sometimes, thickening from irritated tendons or other swelling narrows the tunnel and causes the median nerve to be compressed. The result may be pain, weakness, or numbness in the hand and wrist, radiating up the arm. Although painful sensations may indicate other conditions, carpal tunnel syndrome is the most common and widely known of the entrapment neuropathies in which the body's peripheral nerves are compressed or traumatized."  National Institute of Neurological Disorders and Stroke, *Carpal Tunnel Syndrome Fact Sheet*, *at*  http://www.ninds.nih.gov/ disorders/carpal_tunnel/detail_carpal_tunnel.htm (last visited Sept. 19, 2005).

While it is reasonable to conclude that the claimant should have some pain and/or limitations, the evidence as a whole does not substantiate any cause for such debilitating pain, as described by the claimant, that would preclude all work activity.  Dr. Haté noted the only positive finding on examination was his diminished TPP sensations in both his hands and feet and absent ankle reflexes.  On examination, the claimant had no trouble squatting or toe and heel walking, and straight leg raising was negative bilaterally (Exhibit 3F).  Dr. Cooper stated the claimant had marked limitation of motion of his cervical, thoracic and lumbosacral spines in all directions, but "this was volitional".  He moaned, groaned and winced with pain in any attempt to move his spine in any direction; however, Dr. Homi indicated he "could change positions from sitting to standing and visa versa without any discomfort or verbalizations of pain or grimacing".  His range of motion of his shoulder girdle was also limited to 90 degrees "on a volitional basis" (Exhibit 10F).  There is no evidence that more than conservative treatment was required for his back.  Despite allegations of pain, the record fails to show that the claimant required significant forms of treatment such as periods of hospitalization.  The record also fails to show such a marked diminished range of motion, as would accompany the alleged disability.

TR. 19.

The ALJ found that Knight had the residual functional capacity ("RFC")[3] to perform "the full range of sedentary work which entails lifting of no more than 10 pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools; occasional walking or standing; a good deal of sitting; but no significant stooping."  TR. 19-20.  The ALJ further found that this RFC would not allow Knight to perform his past relevant work.  TR. 20.  Using the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt P, App. 2 (the "grids"), the

---

[3] Residual functional capacity ("RFC") "is what an individual can still do despite his or her limitations."  Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 61 Fed. Reg. 34474-01 (1996).  It takes into account "the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  *Id.*  RFC assesses the individual's ability "to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  *Id.*  RFC does not represent "the least an individual can do despite his or her limitations or restrictions, but the most."  *Id.*

ALJ concluded that Knight could perform a full range of sedentary work and, therefore, was not disabled.  TR. 21.

Knight requested review of the ALJ's decision.  TR. 10. Knight submitted additional evidence to the Appeals Council.  TR. 7, 217-25.  On February 26, 2004, the Appeals Council considered the merits of Knight's request, as well as the additional evidence Knight had submitted, and found that there was no basis for changing the ALJ's decision.  TR. 4-6.  Knight timely sought review of this decision by the United States District Court.  Doc. No. 1.

## II.     JURISDICTION.

The Commissioner issued a final decision after a hearing with respect to Knight's application for disability benefits under OASDI and SSI.  Therefore, the Court has jurisdiction of this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.    STATEMENT OF FACTS.

A.     *Knight's Testimony.*

Knight was born on July 31, 1954.  TR. 229.  At the time of his hearing he stood five feet nine inches tall and weighed one hundred sixty-five pounds.  TR. 229.  His highest level of educational attainment was the seventh grade.  TR. 229.  During his schooling, Knight was held back a grade on two occasions.  TR. 238-39.

Knight previously performed work as a "car tender," or a person who empties containers as they become filled with processed cotton, in a textile mill.  TR. 232-33.  This job involved lifting objects that weighed approximately fifty pounds and pulling objects that weighed approximately 200 pounds.  TR. 233.  Knight performed this work for approximately thirty years.  TR. 233.  He

had performed this work at several textile mills, and lost these jobs because he could not do the work due to back pain.  TR. 239.

Knight stated that he could only read a newspaper with difficulty, and that he could not make change with respect to large bills.  TR. 230.  When he attempted to read the newspaper, he would "just glance at it," and he could not understand the meaning of most of the words.  TR. 238.

Knight's most serious medical problem was pain in his neck, which he had experienced "off and on" for his entire life.  TR. 234.  He described this pain as feeling like having something "sticking in there and twisting . . . like you got a knife in there twisting."  TR. 234.  When he turned his neck it felt like "rubbing two bones together or something."  TR. 234.  Knight's neck pain would radiate into his arms, and he had numbness in his thumb and little finger.  TR. 234.  Knight could raise his arms over his head, but it hurt to do so.  TR. 235.

Knight also had constant pain in his lower back and numbness in the front of his legs due to his degenerative disc disease.  TR. 235.  If he moved his thighs in a certain way, it caused a shooting pain in his lower back.  TR. 235-36.  Knight could only walk for up to 400 or 500 feet before pain would force him to stop.  TR. 236.  He could only sit for approximately thirty or forty minutes before needing to move.  TR. 236.  He also had difficulty walking up and down steps. TR. 236.  The heaviest weight he could lift and carry on a regular basis was eight to ten pounds. TR. 236.  If he needed to pick something up from the ground, he would have to stoop to pick it up; he could not simply bend over for it.  TR. 237.

Knight testified that he did not take any prescription medications for his pain because he could not afford to visit a doctor.[4]  TR. 237.  He treated his pain with over-the-counter medications, but also complained that they did not "seem to help."  TR. 237, 243.  Knight had been diagnosed with bilateral carpal tunnel syndrome, which precluded use of and control over his hands.  TR. 242.

Knight lived with his girlfriend, and his daily activities included watching television and little else.  TR. 237.  Knight did not do any household chores other than laundry.  TR. 237.  He wrote in a questionnaire dated October 1, 2001 that he could cook and prepare meals so long as he did not have to stand long.  TR. 62; *accord* TR. 73.  He enjoyed fishing, but could no longer perform this hobby because he could not "throw rods."  TR. 238.  Otherwise, he engaged in no hobbies or other social activities.  TR. 241.  He had trouble buttoning his shirts, but otherwise he could dress himself if he sat on the bed.  TR. 240.  He did not shave every day because it was a difficult task and shaving hurt his neck, arms, and back.  TR. 241.  He required his girlfriend's assistance to bathe his back.  TR. 241.  Knight was able to sleep for three to five hours per night depending upon the amount of pain he experienced and the type of medication he took.  TR. 242.

B.    *Medical Evidence.*

1.    Medical Records.

On June 5, 2001, Howard R. Bernstein, Ph.D., performed a psychological evaluation of Knight upon referral from Vocational Rehabilitation Services.  TR. 116-19.  Dr. Bernstein noted Knight's physical impairment of disk disorder and carpal tunnel syndrome, and the resulting

---

[4] However, in a statement submitted in support of his claim, Knight asserts that he took Darvocet for relief of his pain.  TR. 61

physical capacity limitation and chronic pain syndrome.  TR. 116.  Dr. Bernstein also noted that

Knight had a history of antisocial behavior secondary to alcohol consumption, but that his alcohol

addiction was in remission.  TR. 116-17.   Dr. Bernstein observed that Knight's attention and

concentration might be disrupted by pain factors.  TR. 117.   IQ tests placed Knight in the low

average range of intellectual ability.  TR. 117.  Dr. Bernstein assessed Knight's reading and

spelling skills as being at a third-grade level, and assessed his arithmetic skills as being at a sixth

grade level.  TR. 117.  Dr. Bernstein concluded that Knight had depressive disorder and

personality disorder with antisocial, borderline, and immature traits.  TR. 119.  Dr. Bernstein

recommended medical stabilization and restoration services, job placement, and Alcoholics

Anonymous attendance.  TR. 119.

On June 18, 2001, Richard P. Newman, M.D., conducted a neurological consultative

examination of Knight at the request of Vocational Rehabilitation Services.  TR. 120-24.  Knight

complained of having had numbness and weakness in his hands for a number of years.  He also

reported chronic neck and low back pain, with headaches and occasional tingling in his legs and

feet.  TR.  120. The only abnormality noted by Dr. Newman was weakness of a muscle in the

thumb (abductor pollicis brevis muscle[5]) on both sides and a positive Tinel's sign at both wrists.[6]

TR. 121-22.  Dr. Newman's impressions were that Knight likely suffered from bilateral carpal

---

[5] GP Notebook, *Abductor Pollicis Brevis Muscle*, at http://www.gpnotebook.co.uk/
cache/772145152.htm (last visited Sept. 19, 2005).

[6] The Tinel's sign test is "[a]n examination test that is used by doctors to detect an irritated nerve. Tinel's sign
is performed by lightly banging (percussing) over the nerve to elicit a sensation of tingling or 'pins and needles' in the
distribution of the nerve.  For example, in a person with carpal tunnel syndrome where the median nerve is compressed
at the wrist, Tinel's sign is often 'positive' and causes tingling in the thumb, index, and middle fingers."  MedicineNet,
Inc., *Definition of Tinel's Sign*, *at*  http://www.medterms.com/script/main/art.asp?articlekey=16688 (last visited Sept. 19,
2005).

tunnel syndrome, possible cervical spondylosis,[7] possible lumbar disc disease, and hypertension. TR. 122. Dr. Newman noted that Knight was seeking pain management, but Dr. Newman was unwilling to administer such treatment based on his evaluation. TR. 122. A subsequent nerve conduction study confirmed that Knight had bilateral carpal tunnel syndrome. Dr. Newman recommended that Knight be referred for carpal tunnel release surgery. TR. 123.

On July 17, 2001, Nitin Haté, M.D., completed a disability evaluation of Knight based on an examination. TR. 125-27. Knight complained of numbness in both legs, but no radiating pain, right shoulder pain, bad headaches, and a grinding noise in his neck. TR. 125. Dr. Haté noted that Knight had a diminished touch and pin-prick sensation in both of his hands and feet. TR. 126. Knight had no deep tendon reflexes in his ankles, but his muscle strength and gait were normal. TR. 126. His grip strength and gross and fine manual dexterity was also normal. TR. 126. The range of motion in Knight's thoracolumbar spine was reduced. TR. 126. Dr. Haté's impression was that Knight had early peripheral neuropathy. TR. 127. Dr. Haté opined that Knight might have difficulty in strenuous physical activities, particularly those requiring repetitive stooping. TR. 127.

A July 20, 2001, X-rays of Knight's spine revealed some degenerative changes in the cervical and lumbar spine. TR. 157, 159. X-rays of Knight's shoulders taken the same day revealed no visible pathologies. TR. 160.

Between July and November 2001, Faiaz M. Rasul, M.D., treated Knight for pain. TR. 152-56, 185. Dr. Rasul's notes reflect that he observed muscle spasms and that straight-leg raising

---

[7] Spondylosis refers to "any lesion of the spine of a degenerative nature." STEDMAN'S MEDICAL DICTIONARY 1656 (26th ed. 1995) (hereinafter "Stedman's").

tests were positive.[8] TR. 152, 154, 185.  Dr. Rasul assessed Knight with carpal tunnel syndrome, sciatica,[9] cervicalgia (non-radiating neck pain), and hypertension, and he prescribed Darvocet,[10] Ultram,[11] Celebrex,[12] Vioxx,[13] and a carpal tunnel splint.  TR. 155-56, 185.  On August 3, 2001, Dr. Rasul referred Knight to a pain management doctor.  TR. 155.  An August 28, 2001 MRI of Knight's spine revealed degenerative changes in the lower lumbar region and an abnormal signal in the sacrum[14] which could have represented an insufficiency fracture.  TR. 158, 185.

In September 2001, the Brevard Achievement Center assessed Knight's job skills.  The evaluator concluded that Knight was below average in "wrist-finger speed, manual dexterity, two hand coordination, perceptual accuracy, abstract reasoning, verbal reasoning and numerical reasoning."  TR. 198.  He demonstrated the ability to concentrate.  TR. 201.  His physical stamina was appropriate to complete the evaluation.  TR. 202.

---

[8] "'The simple straight-leg raising test [SLR] is performed with the patient lying supine, with the backs of the knees flat on the examining table. The knee is held straight, and the foot of one leg is raised while the hip is slowly flexed. Flexion of the leg through a range of 60 to 90 degrees is considered to be normal. The test is positive when pain is reproduced down the posterior thigh below the knee between the angle of 30 to 70 degrees.'" *Menezes v. Apfel*, No. CIV. 99-168-B., 2000 WL 1499491, at *1 n.7 (D.N.H. May 4, 2000) (quoting ATTORNEYS' TEXTBOOK OF MEDICINE ¶ 15.34(1) (3d ed.1999)).

[9] Sciatica refers to "[p]ain in the lower back and hip radiating down the back of the thigh into the leg . . . ." Stedman's at 1580.

[10] Darvocet is a narcotic analgesic pain relief drug. DRUGS.COM, *at* http://www.drugs.com/darvocet.html (last visited Sept. 19, 2005) (hereinafter "Drugs.com").

[11] Ultram is a pain relief medication that affects the chemicals and receptors related to pain in the nervous system. Drugs.com, *at* http://www.drugs.com/ultram.html (last visited Sept. 19, 2005).

[12] Celebrex is a non-steroidal anti-inflammatory drug. Drugs.com, *at* http://www.drugs.com/celebrex.html (last visited Sept. 19, 2005).

[13] Vioxx is also a non-steroidal anti-inflammatory drug. Drugs.com, *at* http://www.drugs.com/vioxx.html (last visited Sept. 19, 2005).

[14] The sacrum is the part of the vertebral column that forms part of the pelvis. Stedman's at 1566.

On March 6, 2002, Homi S. Cooper, M.D., conducted a consultative examination of Knight to investigate his neck and back pain, and tingling and numbness in his hands.  TR. 186.  Dr. Cooper noted that Knight had a marked limitation of motion of the cervical, thoracic, and lumbosacral spine in all directions, and in the shoulder girdle, but that this was volitional.  TR. 187.  Dr. Cooper noted, "[Knight] moaned and groaned and winced with pain on having any attempt to move his spine in any direction.  However he could change positions from the sitting to the standing and vice versa without any discomfort or verbalizations of pain or grimacing."  TR. 187.  Strength was normal, except for a slight reduced strength in his thumb, which Dr. Cooper presumed was the result of carpal tunnel syndrome.  Knight's gait was normal, and his sensation appeared to be intact.  TR. 187.  Dr. Cooper's impression was subjective complaints of pain with a history of radiculopathy.[15]  TR. 187.  Dr. Cooper ordered MRIs of Knight's back to allow him to better evaluate Knight's condition.  TR. 188.  A March 21, 2002, MRI of Knight's cervical spine revealed multilevel severe cervical canal stenosis[16] and likely small disc bulges.  TR. 190.

On July 29, 2002, Paul M. Keller, M.D., examined Knight on a referral from Dr. Cooper.  TR. 192-94.  Knight described his pain as ten, the most severe point on the pain scale.  TR. 192.  Dr. Keller observed muscle tenderness in the cervical and lumbar area, and decreased sensation in Knight's right thumb.  Otherwise motor strength was normal.  TR. 193.  Dr. Keller's diagnoses were degenerative disc disease of the cervical spine and significant cervical stenosis and neural

---

[15] Radiculopathy refers to any disorder of the spinal nerve roots.  Stedman's at 1484.

[16] Stenosis refers to the stricture of any canal, in this case, the spinal cord.  Stedman's at 1673.

foraminal[17] stenosis of the cervical spine.  TR. 193.  Dr. Keller opined that the pain down Knight's arms were mostly coming from his cervical spine.  Knight indicated that he would like to have surgery to correct the problem.  TR. 193-4.  Dr. Keller requested authorization to perform a discectomy and spinal fusion surgery.  TR. 191, 194.

In August 2002, the Brevard Achievement Center assessed Knight's ability to return to work.  Knight attended only part of one day of the seven day program.  In the part of the day that Knight attended the assessment, his stamina and pain tolerance were limited for performing simple, repetitive tasks.  The evaluator observed that Knight's "motivation and reliability were very questionable."  TR. 195-6.

Records presented to the Appeals Council reflect that Knight had psychiatric examinations and treatment with antidepressants in 2002.  TR. 218-25.

B.      *Reviewing Physicians' Opinions.*

1.      Physical Condition.

On August 14, 2001, a physician whose name is not legible completed a physical RFC assessment of Knight based on a review of his medical records.  TR. 144-51.  This physician opined that Knight would be subject to the following limitations: (1) occasionally lifting or carrying no more than fifty pounds; (2) frequently lifting or carrying no more than twenty-five pounds; (3) standing or walking for a total of six hours in an eight-hour workday; (4) sitting for a

---

[17] Foraminal means relating to the foramen, which is an aperture or perforation through a bone or a mebranous structure.  Here the foramen in question appears to be the opening in the vertebrae through which the spinal cord passes. Stedman's at 674.

total of six hours in an eight-hour workday; and (5) unlimited pushing or pulling.  TR. 145.  This physician did not find that Knight would be subject to any other limitations.  TR. 146-51.

On October 28, 2001, another physician whose name is not legible completed a physical RFC assessment of regarding Knight.  TR. 163-70.  This physician reached the same conclusions as the physician who completed the August 14, 2001, RFC assessment.

2.    Mental Condition.

On July 27, 2001, Jane F. Cormier, Ph.D., completed a psychiatric review technique form ("PRTF")[18] after a review of Knight's records.  TR. 130-43.  Dr. Cormier opined that Knight had the non-severe mental impairments of affective disorder and personality disorder.  TR. 130.  She further opined that Knight had the medically determinable impairment of depression.  TR. 133.  Dr. Cormier further found that he had the personality trait of pathological dependence.  TR. 137.  She opined that Knight would have mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  TR. 140.

On November 17, 2001, Deborah L. Carter, Ph.D., completed a PRTF regarding Knight.  TR. 171-84.  Dr. Carter opined that, in addition to the impairments Dr. Cormier noted, Knight had an organic mental disorder and a substance abuse disorder.  TR. 171.  Dr. Carter also noted that Knight had the medically determinable impairment of depression, and further opined that he had

---

[18]  "[SSA] regulations require the ALJ to use the 'special technique' dictated by the PRTF for evaluating mental impairments. . . . This technique requires separate evaluations on a four-point scale of how the claimant's mental impairment impacts four functional areas:  activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. . . . The ALJ is required to incorporate the results of this technique into the findings and conclusions."  *Moore v. Barnhart*, 405 F.3d 1208, 1213-14 (11th Cir. 2005) (internal quotation marks and citations omitted).

an antisocial, borderline, immature impairment.  TR. 174, 178.  Dr. Carter's opinion regarding

Knight's limitations was the same as that of Dr. Cormier.  TR. 181.  Dr. Carter also concluded that

Knight did not have any severe mental impairments.  TR. 171.

**IV.    STANDARD OF REVIEW.**

To be entitled to Social Security disability benefits under SSI and OASDI, a claimant must

be unable to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which has lasted or can be expected to last for a continuous period

of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or

mental impairment" under the terms of the Act is one "that results from anatomical, physiological,

or psychological abnormalities which are demonstrable by medically acceptable clinical and

laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C).  The Act provides

further that a claimant is not disabled if he or she is capable of performing his previous work.  42

U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  In a case seeking disability benefits under OASDI, the

claimant also must show that he or she became disabled before his or her insured status expired in

order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d

1088, 1090 (5th Cir. 1979).

The scope of this Court's review is limited to determining whether the ALJ applied the

correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the

findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).

"Substantial evidence is more than a scintilla, and must do more than create a suspicion of the

existence of the fact to be established. It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987) (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision. *Id.* While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

## V.    ANALYSIS.

Knight asserts that the ALJ improperly assessed his complaints of pain and other symptoms and failed to address his ability to engage in sustained work activity. As a result, he submits that the ALJ reached an improper determination regarding his RFC. He also contends that he has nonexertional impairments that required that the ALJ call upon a vocational expert at step five of the evaluation, rather than relying upon the grids. I address only the ALJ's assessment of Knight's complaints of pain and other symptoms because I find this issue to be dispositive.

> The appropriate legal standard for evaluating a claimant's subjective complaint of pain is for the Secretary to consider a claimant's subjective testimony of pain if [he] finds evidence of an underlying medical condition, and either (1) objective medical evidence to

> confirm the severity of the alleged pain arising from that condition
> or (2) [that] the objectively determined medical condition must be of
> a severity which can reasonably be expected to give rise to the
> alleged pain. *Mason v. Bowen*, 791 F.2d 1460, 1462 (11th Cir.
> 1986) (citation omitted).

*Walker v. Bowen*, 826 F.2d 996, 1004 (11th Cir. 1987).  If proof of a disability is based upon

subjective evidence and a credibility determination is critical to the decision, "the ALJ must either

explicitly discredit such testimony or the implication must be so clear as to amount to a specific

credibility finding." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995).  If the Commissioner

discredits the claimant's subjective testimony, she "must articulate explicit and adequate reasons

for doing so." *Id.* at 1561-62.

   In the present case, the ALJ found that Knight had underlying medical conditions that

could result in the subjective symptoms about which Knight complained.  The ALJ concluded,

however, that the pain and other functional limitations arising from these medical conditions were

not as severe as Knight represented them to be.  The question before this Court is whether this

conclusion is supported by substantial evidence in the record.

   The ALJ based his credibility conclusion on findings in the record by Dr. Haté that Knight

could walk and squat despite diminished sensation in his hands and feet and absent ankle reflexes.

He also relied heavily on Dr. Cooper's observation that Knight's complaints of pain were

"volitional," which conclusion was supported by the fact that although Knight complained of pain

on range of motion tests, he was able to change positions from sitting to standing without

discomfort or complaints of pain. The ALJ did not discuss in this portion of his analysis the

findings of Dr. Rasul, one of Knight's treating physicians.  Dr. Rasul's records reflect that Knight

had muscle spasms and positive straight-leg raising tests, all of which are objective evidence of pain.  Because Dr. Rasul was a treating physician, the ALJ was required to address his findings regarding Knight's complaints of pain and functional limitations.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)

The ALJ also relied upon a finding that the record showed only conservative treatment. This conclusion is not supported by substantial evidence.  Dr. Newman recommended carpal tunnel release surgery, and Dr. Keller sought authorization to perform a discectomy and spinal fusion. Knight testified that he could not afford treatment, which testimony is supported by Dr. Keller's request for authorization to perform surgery on Knight.  Lack of more aggressive treatment of Knight's pain may, therefore, be the result of poverty rather than absence of need for such treatment.  *Cf. Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988) (holding that poverty excuses noncompliance with treatment).

Because the ALJ failed to address the findings of Dr. Rasul, a treating physician, in reaching his credibility determination, and misread the record regarding the need for more aggressive treatment to address Knight's complaints of pain and other functional limitations, remand is required.  If the ALJ determines on remand that Knight has any nonexertional limitations, the best practice is to call upon a vocational expert at step five of the evaluation process.  *See Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999).  If the ALJ again determines that Knight can perform a full or wide range of work at a given exertional level, and chooses to rely on the grids, he must articulate the basis of that decision to permit meaningful review.  *See*

*Owens v. Heckler*, 748 F.2d 1511, 1515 (11th Cir. 1984) (noting that the ALJ must articulate the basis of his decision to provide the Court with a sufficient record for review).

## VI.    CONCLUSION.

For the reasons stated above, the decision of the SSA is **REVERSED** and the case is **REMANDED** for further proceedings.  It is further **ORDERED** that the Clerk of Court shall issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 22, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties